# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BRIAN CORCORAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 10 C 6825 |
| ) | |
| THE CITY OF CHICAGO, ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Brian Corcoran ("Corcoran") alleges that Defendant, the City of Chicago Police Department ("the City"), violated Title VII of the Civil Rights Act by retaliating against Corcoran for his complaints about racial slurs made by coworkers (Count I). In a second count of his complaint, Corcoran alleges that the City's intentional "severe and humiliating retaliatory actions" constitute the tort of intentional infliction of emotional distress ("IIED"). The City has moved to dismiss Count II on the grounds of preemption and failure to state a claim. For the following reasons, the motion is granted.

## FACTUAL BACKGROUND

Brian Corcoran began working as a police officer at the City's 18th District Station in November 1993. (Pl.'s Compl. ¶ 6, 7.) Until 2009, Corcoran was assigned to work as a patrol officer but had no regular beat number or assigned partner. (*Id.* at ¶ 9.) In the first week of April 2009, Corcoran alleges that he overheard Sgt. Kelly Braithwaite ("Sgt. Braithwaite") call Officer Alvin Campbell a "fat lazy nigger." (*Id.* at ¶ 10.) Corcoran promptly told Campbell what he had heard, and Campbell reported the matter to Captain Randall Zawis ("Captain Zawis"). (*Id.* at ¶ 11.) Several days later, the Independent Police Review Authority ("IPRA") began an investigation concerning the slur. (*Id.*)

Corcoran alleges that beginning on April 11, 2009, the City, through its agents, took severe

and humiliating retaliatory action against him.[1]  (*Id.* at ¶ 12.)  First, on April 11, 2009, Captain Ken Angarone, and Captain Zawis reassigned Corcoran and Officer Campbell to Beat 1822F–a fixed post between the 364 and 365 West Oak Street Buildings at Cabrini Green.  (*Id.* at ¶¶ 13, 14.)  Supervisors required Corcoran to request face-to-face relief in order to take lunch breaks or personal breaks, and barred him from leaving the post without another officer taking over for him–a requirement that was not imposed on Officers Wadell Hardy and James Martin, who had been assigned to the post before Plaintiff.  (*Id.* at ¶¶ 15, 16.)  Corcoran alleges that Beat 1822F is known as "the punishment car" among his fellow officers.  (*Id.* at ¶¶ 18, 20.)  In fact, when Corcoran asked Lieutenant Bialek, on or around May 6, 2009, why he had been assigned to Beat 1822F, Bialek "told the Plaintiff in sum and substance" that the Captain assigned officers to that Beat "as punishment for various infractions."  (*Id.* at ¶ 19.)

In addition to the undesirable assignment, Corcoran alleges that the City retaliated against him by several "false write-ups," also known as SPARs (the parties do not explain this acronym).  On May 15, 2009, Sgt. Braithwaite issued a SPAR to Corcoran for failing to appear at a "check-off" at the 18th District, although she knew that Corcoran was in fact present at that time.  (*Id.* at ¶ 21.)  Corcoran requested a review of these allegations, but Commander Steve Georgas affirmed Sgt. Braithwaite's decision.  (*Id.* at ¶ 21.)  When Corcoran sought review at the next level of command, however, Central Control Group Deputy James Keating dismissed the charges in the SPAR. (*Id.*)

Second, on or around June 3, 2009, at the direction of Commander Georgas, Sgt. Cindy Schuman issued another SPAR to Plaintiff for not being present at check-off two days earlier.  (*Id.* at ¶ 22.)  Corcoran does not allege that he was in fact present at that time, but he asserts that the SPAR was falsely issued because neither Sgt. Schuman herself nor any other sergeant was

---

[1] The court is uncertain whether the alleged retaliatory actions against Corcoran began before or after the IPRA began its investigation. (*See* Pl.'s Compl. ¶ 13 (statiing that "just days [sic] IPRA began their investigation . . ." the City engaged in retaliatory actions).)

present at the check-off. (*Id.*) Corcoran requested a hearing with Commander Georgas to contest the SPAR, but was ultimately suspended for one day as a result of this incident. (*Id.*)

On June 25, 2009, Sgt. Brian Byrne arrived at Plaintiff's post and demanded that Plaintiff and Officer Campbell complete a memorandum explaining why they remained in their vehicle at their fixed post. (*Id.* at ¶ 23.) Until that date, Plaintiff had not "received any order stating that Beat 1822F was a foot post," but he nevertheless completed the report as instructed. (*Id.*) Several days later, Sgt. Bryne issued a SPAR charging Plaintiff with failure to perform an assigned task, based on a report that Commander Georgas had observed Plaintiff seated in a squad car "'after being instructed . . . to . . . stand in the lobby at 364-465 W. Oak.'" (*Id.* at ¶ 24.) Plaintiff requested a hearing to review this discipline, and the Acting Commander dismissed the charges. (*Id.*) Plaintiff alleges that after June 25, 2009, his assignment to work "a fix post patrol car" was converted to a foot post in the building lobby, but in January 2010, the assignment "changed back to a patrol car at a fixed post" between two Cabrini Green Housing Development buildings. (*Id.* at ¶¶ 25, 27.)

A few days later, on January 18, 2010, Sgt. Braithwaite announced that Plaintiff Corcoran and Officer Campbell "could not get gas or a car wash for their vehicle from that date forward." (*Id.* at ¶ 28.) Sgt. Braithwaite offered no reason for this prohibition but described it as a decision made in a meeting with other lieutenants and sergeants. (*Id.*) Plaintiff spoke with Sergeant Byrne, who confirmed Braithwaite's order. (*Id.* at ¶ 29.) Prior to that date, Corcoran, like all other officers in the 18th District, was permitted to get gas or a car wash without seeking permission from a supervisor. (*Id.* at ¶¶ 28, 30.) On January 23, 2010, Sgt. Braithwaite issued Corcoran a counseling form for being approximately ten minutes late for a roll call–a form Plaintiff believes is false because Sgt. Braithwaite never conducted a formal roll call on that date. (*Id.* at ¶ 31.)

On March 18 and 19, 2010, Lieutenant Mack conveyed a direction from Captain Zavis that Plaintiff was expected to perform additional responsibilities–specifically, hourly "'walk downs' in the buildings located at Cabrini Green," to check for suspicious activity in the stairwells. (*Id.* at ¶ 32.)

3

Braithwaite explained that "'everyone is hot and heavy about your [Plaintiff's] Beat,'" a statement Corcoran understood to mean that he was expected to "meet certain quotas for activity." (*Id.* at ¶ 33.) At some point in March 2010, Officer Campbell took medical leave and was replaced by Officer Luckett. (*Id.* at ¶ 34.) Sgt. Joyce offered to change Luckett's assignment at Luckett's request, though Plaintiff's own repeated requests for such a change (one written request and numerous verbal requests) had all been denied. (*Id.* at ¶ ¶ 34, 35.)

On March 26, 2010, Corcoran filed an EEOC charge against the City, alleging retaliation in violation of Title VII. (*Id.* at ¶ 36.) Three weeks later, on April 17, 2010, Corcoran filed a grievance with the Chicago Fraternal Order of Police ("FOP"), citing retaliation as his complaint. (*Id.* at ¶ 38.) After making these complaints, Plaintiff was subjected to further retaliation: On May 12, 2010, while Plaintiff was working inside a Cabrini Green building with a new partner, Officer Parrish Sevier, Captain Zawis drove past their patrol car parked outside. (*Id.* at ¶ 39.) Zavis issued a "counseling session report" in which he charged Plaintiff with having reading material and a laptop in his vehicle. The report was false; there was no reading material in the vehicle, and the only laptop in the car belonged to Officer Sevier and was in its case, as required. (*Id.*) Plaintiff claims that on that same day or the following day, Captain Zavis directed Officer Sevier to make a written statement "saying that he did not want to work with Plaintiff" but Sevier refused to do so. (*Id.* at ¶ 40.) On May 16, 2010, Plaintiff was reassigned to the 14th District. (*Id.* at ¶ 41.) He contends in this lawsuit that the assignment to Beat 1822F and the improper discipline constitutes retaliation for his protected activity (the complaint he made about a racial slur) and the tort of intentional infliction of emotional distress.

## **DISCUSSION**

The City moves to dismiss Plaintiff's claim of intentional infliction of emotional distress for failure to state a claim and as preempted by the Illinois Worker's Compensation Act or the Illinois Human Rights Act. For purposes of this ruling, the court assumes that Plaintiff has met the

relatively low standard for stating a claim for relief under FED. R. CIV. P. 8(a): To meet the Rule 8(a) standard, the claim need only be "plausible," meaning that the complaint must set forth enough facts "'to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).[2] Instead, the court turns to Defendant's preemption arguments, as these appear to be dispositive.

I.    **Illinois Worker's Compensation Act**

The Illinois Workers' Compensation Act ("IWCA") provides the exclusive remedy for workers who suffer on the job injuries and bars recovery under other theories. 820 ILCS 305/5(a); *Meerbrey v. Marshall Field & Co., Inc.,* 139 Ill.2d 455, 463, 564 N.E.2d 1222, 1226 (1990). There are, however, exceptions to the exclusivity rule: an employee may sue his employer for injuries if he can establish "(1) that the injury was not accidental; (2) that the injury did not arise from his or her employment; (3) that the injury was not received during the course of employment; or (4) that the injury was not compensable under the Act." *Id.* Plaintiff Corcoran invokes the first of these exceptions–he argues that his injuries were not accidental. (Pl.'s Resp. in Op. to Def.'s Mot. to Dismiss Count II of Pl.'s Compl. at 7.) This exception is unavailable where the injury was inflicted on an employee by a coworker, without the employer's authorization, *Hunt-Golliday v. Metropolitan*

---

[2] The court notes, however, that the matter is not free from doubt. A claim of intentional infliction of emotional distress claim requires a showing "(1) that the defendants' conduct was extreme and outrageous; (2) that the emotional distress suffered by plaintiff was severe; and (3) that defendants' conduct was such that defendants knew that severe emotional distress would be substantially certain to result." *Vickers v. Abbot Laboratories,*, 308 Ill. App.3d 393, 410, 719 N.E.2d 1101, 1115 (1st Dist. 1999), citing *Tabora v. Gottlieb Memorial Hospital*, 279 Ill. App.3d 108, 119, 664 N.E.2d 267, 275 (1st Dist. 1996). To constitute intentional infliction of distress, the defendants' conduct must go "'beyond all possible bounds of decency,' . . . [because] mere insult, threat or annoyance is insufficient." *Vickers*, 308 Ill. App.3d at 410, 719 N.E.2d at 1115. Moreover, "everyday job stresses" do not support such a claim, and for that reason, "courts often hesitate to find that a plaintiff has stated a claim for intentional infliction of emotional distress in employment situations." *Id.* at 410, 719 N.E.2d at 1115, citing *Miller v. Equitable Life Assurance Society*, 181 Ill. App.3d 954, 957-58, 537 N.E.2d 887, 888 (1st Dist. 1989) and *Lundy v. City of Calumet City*, 209 Ill. App.3d 790, 793-94, 567 N.E.2d 1101, 1103 (1st Dist. 1991).

*Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1016 (7th Cir. 1997); *Meerbrey,* 139 Ill.2d at 463, 564 N.E.2d 1222, but does allow for a tort claim in some circumstances in which the injury is inflicted by a supervisor with the express authorization of the employer. *Hunt-Golliday*, 104 F.3d at 1016-17.

Corcoran urges that this doctrine applies here, where he has alleged (1) that the Commander and the Captain of the 18th District made policy decisions, including work assignments, and therefore "spoke for the City"; (2) that his supervisors were aware of the retaliation against him and (3) that no supervisor took action to prevent that retaliation. (Pl.'s Resp. in Op. to Def.'s Mot. to Dismiss Count II of Pl.'s Compl. at 9.) Plaintiff cites *Thomas v. Habitat Co.*, where there was evidence that plaintiff's supervisor made sexual advances and the supervisor's own superior was aware of the harassment but took no action. The district court concluded that plaintiff's assault and battery claims could proceed despite the exclusivity provisions of the IWCA because "'management's knowledge coupled with lack of follow-up action is equivalent to express authorization of injurious conduct.'" 213 F. Supp. 2d 887, 892 (N.D. Ill. 2002) (citations omitted). In the case before this court, it is not clear that any of the persons who supervised Plaintiff's own superiors were aware of the alleged retaliatory conduct; indeed, in at least one instance in which Corcoran reported a "false SPAR" to a manager at the next level, the deputy at that level granted Plaintiff's request for a hearing and ultimately dismissed the SPAR against him. (Pl.'s Compl. ¶ 21.) *Cline v. General Electric Capital Auto Lease, Inc.*, 757 F. Supp. 923, 931 (N.D. Ill. 1991), also cited by Plaintiff, is distinguishable as well. In *Cline*, internal office memos revealed that company managers were not only aware that plaintiff's supervisor mistreated him, but in fact tolerated the abuse because the supervisor's department was doing extremely well. *Id.* In the case before this court, there is no allegation that any those persons who supervised Corcoran's own superiors were aware of the wrongdoing or specifically tolerated it.

For these reasons, Plaintiff may be unable to establish that his supervisors' conduct is

6

attributable to the City for purposes of invoking the intentional tort exception to IWCA's exclusivity provision. *See Hunt-Golliday*, 104 F.3d at 1017 ("the fact that a supervisor was acting within the scope of his or authority does not equal authorization by the employer for the commission of a n intentional tort"). The court is nevertheless reluctant to dismiss the case on this basis at the pleading stage. The officers who supervised Plaintiff effectively speak for the City if they "had sufficient decisional and policy-making authority to be considered the [City's] alter ego[]." *Arnold v. Janssen Pharmaceutical, Inc.*, 215 F. Supp. 2d 951, 958 (N.D. Ill. 2002); *Crissman v. Healthco Int'l, Inc.*, No. 89 C 8298, 1992 WL 223820, at *8 (N.D. Ill. Sept. 2, 1992). The fact that Plaintiff's supervisors had the power to assign him to particular beats may not be sufficient evidence of their "decisional and policy-making authority," but at this stage, drawing all inferences from the pleadings in Plaintiff's favor, the court declines to dismiss his IIED claim on the basis of the exclusivity doctrine. .

## II.    Illinois Human Rights Act

The City's alternative argument for preemption has greater traction. The Illinois Human Rights Act provides that "no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(D). Where an Illinois state court lacks jurisdiction, so too does a federal court sitting in Illinois. *Arnold v. Janssen Pharmaceutica, Inc.*, 215 F. Supp. 2d 951, 958 (N.D. Ill. 2002). Whether a common law claim is displaced by the IHRA "'depends upon whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act itself.'" *Id.* (quoting *Maksimovic v. Tsogalis,* 177 Ill.2d 511, 515, 687 N.E.2d 21, 23 (1997)). The fact that there is factual overlap is not outcome determinative. "Rather, the critical question is whether the plaintiff can 'establish the necessary elements of the tort independent of any *legal duties* created by the Act.'" *Id.* (quoting *Maksimovic*, 177 Ill.2d at 515, 687 N.E.2d at 24).

Corcoran asserts that, under the *Maksimovic* test, he can prove the elements of his IIED

claim independent of legal duties furnished by the IHRA. Controlling authority appears to defeat this argument, however. In *Sanglap v. LaSalle Bank FSB*, 345 F.3d 515, 519 (7th Cir. 2003), the plaintiff had a series of seizures while doing business at defendant bank, and the defendant subsequently closed the plaintiff's account. *Id.* at 516-17. Plaintiff brought suit alleging a violation of the Americans with Disabilities Act ("ADA"), and alleged, further, that the defendant intentionally caused him emotional distress. *Id.* at 517. On appeal from a judgment in favor of the bank, the Seventh Circuit acknowledged, first, that discrimination and intentional infliction of emotional distress are different wrongs. *Id.* at 519. In the bank customer's case, however, the court pointed out, "eliminating the civil rights component takes the air out of the case." *Id.* As the court observed, without the allegation that the bank had treated him differently on the basis of his disability, the plaintiff would be forced to make the untenable argument that "closing a bank account for *any* reason will support a claim for intentional infliction of emotional distress." *Id.* at 520.

      The same reasoning applies here. Stripped of any allegations of retaliation for his complaint about discrimination, Plaintiff Corcoran's complaint does not support a claim for IIED; it merely alleges complaints about working conditions ranging from undesirable assignments to being required to ask permission to get gas and a car wash. An unfavorable assignment (patrolling Cabrini Green) cannot constitute infliction of emotional distress; if it could, then all officers assigned to Beat 1822F for a prolonged period of time could potentially allege an IIED claim. Nor can a few disciplinary notices, even if unsupported by the facts, reach the level of severity required for this tort, particularly in light of the fact that at least some of the purportedly false SPARs were resolved and overturned via a hearing process. As in *Sanglap*, "sanitized of the allegation" that the City treated him differently because he engaged in the protected activity of complaining of discrimination, Corcoran is left to argue that receiving an unfavorable work assignment or discipline that is incorrect for *any* reason will support a claim for intentional infliction of emotional distress. Like the *Sanglap* court, this court is confident the Supreme Court of Illinois would reject such a

conclusion. Because Corcoran's claim that the City intentionally inflicted emotional distress is inextricably linked to his alleged civil rights violation, the IHRA bars his IIED claim.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss [12] is granted and Count II of the Plaintiff's Complaint is dismissed without prejudice.

ENTER:

Dated: May 25, 2011

_____
REBECCA R. PALLMEYER
United States District Judge